**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| ALEX R. WHITE, PLLC and NICHOLAS ALEXIOU,<br><br>*Plaintiffs*,<br><br>vs.<br><br>ISAACS & ISAACS P.S.C.,<br><br>*Defendant*. | Civil Action No. 3:26CV-431-DJH<br><br><br>**COMPLAINT**<br><br><br>**JURY DEMAND** |

## I. INTRODUCTION

1. Darryl Isaacs, the self-styled "Kentucky Hammer," built one of the largest motor-vehicle personal-injury practices in the region. This case is not about how he built it, however. It is about what he does to make sure no one else can compete with him.

2. Defendant Isaacs & Isaacs P.S.C. ("Isaacs") has erected a system designed to trap attorneys inside the firm and to punish, financially and reputationally, any who leave. At the center of that system are take-it-or-leave-it employment agreements that purport to claim seventy percent of every fee any departing lawyer earns on any client who follows him, plus an $8,000-per-client liquidated-damages penalty, a $6,000 "case acquisition cost" engineered to survive judicial review, and a gag on the very communications by which clients are told they have a choice of counsel. The terms are not calibrated to any legitimate interest of the firm. They violate the ethics rules of every state in which Isaacs practices, and a Kentucky appellate court has already invalidated a materially identical arrangement.

3. The contracts are one prong of a broader scheme. Isaacs forbids its attorneys from discussing their compensation with one another, in plain violation of federal labor law, so that no

one inside the firm can discover how uncompetitive the terms have become. It makes examples of employees who hesitate to sign, firing one long-time attorney for asking to take a weekend to read a new version of the agreement before signing.

4.      And when an attorney does leave, Isaacs locks him out of the firm's systems before he can tell his clients where he has gone.

5.      But what's worse, Isaacs then files baseless lawsuits against such departing attorneys and their new firms, carefully omitting a breach-of-contract claim that would force arbitration so that Isaacs' litigation can do its intended public damage.

6.      The Plaintiffs in this lawsuit are not the first targets. On information and belief, the Kentucky Hammer has sued as many as five former attorneys and their new employers in the past eighteen months. It would be shocking to find any regional business with five simultaneous active lawsuits against former employees. That a law firm with fewer than thirty attorneys working in a particular market would sue five associate-level attorneys on their way out the door is unimaginable.

7.      The casualties of this scheme are not only the lawyers Isaacs targets. They are the accident victims who never learn their attorney has left, who never get the chance to choose who represents them, and whose cases are stranded inside a firm whose own advertising concedes that "services may be performed by other attorneys." They are the smaller firms and solo practitioners who cannot fairly compete for talent against a dominant incumbent that has rigged the terms of departure. And they are the consumers of motor-vehicle personal-injury services across greater Kentuckiana, who pay the price in higher fees, narrower choice, and reduced quality in a market the Kentucky Hammer has worked to strangle.

8.      Plaintiffs Nicholas Alexiou and Alex R. White, PLLC, bring this action to put a stop to it. They seek treble damages under the Sherman and Clayton Acts for Isaacs' attempted monopolization and unlawful restraint of trade in the market for motor-vehicle personal-injury attorneys' services in greater Kentuckiana; compensatory and punitive damages for its abuse of process; a declaration that its employment agreement is void as contrary to public policy; and an injunction barring its continued enforcement against any current or former attorney of the firm.

## II.    PARTIES

9.      Plaintiff Alex R. White, PLLC, is a Kentucky professional limited liability company providing motor-vehicle personal-injury attorney services in the Kentuckiana area and is headquartered in Jefferson County, Kentucky.

10.     Plaintiff Nicholas Alexiou is an attorney licensed to practice law in the state of Indiana and the Commonwealth of Kentucky. At all times relevant, Mr. Alexiou was a citizen of the Commonwealth of Kentucky.

11.     Defendant Isaacs & Isaacs P.S.C., is a Kentucky Professional Services Corporation with its principal place of business at 1601 Business Center Court, Louisville, Kentucky, 40299. At all times relevant, Isaacs has engaged in the business of providing legal services in the Western District of Kentucky.

## III.    JURISDICTION AND VENUE

12.     This action arises under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover threefold damages, costs of suit, and reasonable attorneys' fees for the injuries sustained by the plaintiffs resulting from Isaacs' unlawful anticompetitive scheme to inhibit competition in the market for motor-vehicle personal-injury attorneys' services. This action further arises out of the laws of the Commonwealth

of Kentucky, including common law, and seeks all available remedies to afflicted parties bringing such claims.

13.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. § 15.

14.     Venue is appropriate within this district under 15 U.S.C. §§ 15(a), 22 (nationwide venue for antitrust matters), and 28 U.S.C. §1391(b), (c), and (d) (general venue provisions).

15.     Isaacs transacts business within this district, transacts its affairs and carries out interstate trade and commerce in substantial part in this district, and/or it or its agents may be found in this district.

16.     Isaacs' conduct was within the flow of, was intended to, and did have a substantial effect on, interstate commerce of the United States, including in this district. During the limitations period, Isaacs provided legal services; contracted with, hired, retained, and separated employees; and advertised its legal services in this district and within an uninterrupted flow of interstate commerce.

17.     During the limitations period, Isaacs and/or one or more of its agents used the instrumentalities of interstate commerce, including the wires, to effectuate its anticompetitive scheme. Isaacs' scheme had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

18.     This Court has personal jurisdiction over Isaacs. Isaacs is headquartered and located in this district; and has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of its illegal scheme throughout the United States and including in this district. The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

### IV.   FACTS

**A.   Personal Injury Attorneys Play A Critical Role In Ensuring Justice For Victims Of Car Accidents.**

19.     A car accident is a scary experience. In the blink of an eye, a victim of an accident can find themselves with no functioning mode of transportation and with serious injuries, sometimes life-threatening or even fatal. Survivors can find themselves facing a lifetime of recovery from significant injuries. Damages from such injuries can result in lost wages, the end of a career, pain and suffering, enormous medical costs, and intangible harm to one's family and quality of life.

20.     The injuries sustained in car accidents are sudden and severe. When a car decelerates quickly (such as when it strikes a vehicle that stopped short in front of it), accelerates suddenly (such as when a stopped vehicle is struck from behind), or rapidly changes direction (such as when it is t-boned by a car running a red light at an intersection), drivers and passengers in that vehicle can sustain head and neck injuries such as concussions, whiplash, or contusions. An expanding airbag meant to mitigate those injuries can snap limbs it encounters. Damage to the vehicle may drive shards of glass, metal, or parts of the engine into the passenger cabin, impaling occupants or causing internal injuries.

21.     Many serious car accident injuries require urgent medical treatment. That treatment can begin at the scene, where victims are met by an ambulance, stabilized in the field, and transported to a nearby hospital. At the hospital, patients may receive trauma care, x-rays and other diagnostics. They may need surgery or multiple surgeries.

22.     Unfortunately, sometimes the injuries sustained in a motor vehicle accident can follow the victim for months, years, or even the rest of their life. Head injuries, for example, can impact cognition, creating difficulties performing everyday tasks or fulfilling the requirements of

a job. A spine injury can render a victim a paraplegic or quadriplegic, leaving them unable to walk, care for themselves, or live independently. Some car accident victims require a lifetime of care. Not infrequently, injuries of the type sustained in motor vehicle accidents can require months' long rehabilitative treatment, sometimes on an in-patient basis. So even after leaving the hospital following an accident, the physical and emotional harm of the accident can stalk a victim, leading to loss of income, loss of enjoyment of life, and loss of consortium.

23.    All these sequelae from an accident—the immediate and long-term medical bills, the lost income, the cost of life-long care and caretakers—cost money. A lot of money. Trauma-related medical bills are expensive. The average cost to a patient of non-surgical treatment for a broken arm, for example, is $2,500; for a fractured leg, it is $7,500. If either fracture requires surgery, the cost quickly balloons to the tens of thousands of dollars. A fractured hip costs, on average, $30,000. Head-related trauma, paraplegia, or quadriplegia from a motor vehicle accident bears a lifetime cost of $850,000 to $3 million or more.

24.    These costs dwarf the average American driver's cost tolerances. A recent report shows that nearly 60% of Americans cannot afford a surprise $1,000 expense.[1]

25.    That is why, in the aftermath of these traumatic events, many victims seek legal representation from motor-vehicle personal-injury attorneys in hopes of recovering medical expenses, providing for future medical care, and receiving compensation for the pain and suffering experienced as a result of the accident.

26.    It is therefore the case that accident victims' first contact with motor-vehicle personal-injury attorneys frequently occurs at a time of heightened vulnerability and uncertainty.

---

[1] *See Most Americans Can't Afford a $1,000 Emergency Expense, Report Finds*, CBS News, available at https://www.cbsnews.com/news/saving-money-emergency-expenses-2025/.

The victim, who has now become the potential client or new client, may be suffering not only any of the injuries discussed, but may have lost loved ones. They could be fighting an insurance company acting in bad faith. Or they may have lost employment as a result of their injuries.

27.    Prosecuting a motor-vehicle personal-injury case involves a relationship of trust and emotional support between the client and the attorney. Even from the earliest meetings between an attorney and a potential client, that potential client must share detailed, sometimes embarrassing, medical information, recount what is likely one of the scariest experiences of her life, and answer invasive questions about their health, physical condition, ability to earn a living, and intimate relationships. This creates a close bond of trust between client and motor-vehicle personal-injury attorneys.

28.    In sharing these private details with the attorney, the client expects the attorney to use that information to the client's benefit; to advocate for the client through compelling and sensitive storytelling; and to make a judge and jury care for the client as much as the attorney does. In short, motor-vehicle personal-injury victims expect their lawyers to care about *them*, *their* wants, and *their* needs, and not just how much the lawyer can profit from their suffering.

**B.    There Should Be A Robustly Competitive Market For Motor-Vehicle Accident Personal-Injury Attorneys' Services In Greater Kentuckiana.**

29.    The relevant antitrust product market, for purposes of the Plaintiffs' claims, is the market for motor-vehicle accident personal-injury attorneys' services. While every lawyer who passes a jurisdiction's bar exam and obtains admission to the jurisdiction's bar is considered competent to practice law as a generalist, most, if not all, lawyers tend to develop an expertise in a specific area of law. Attorneys may seek out opportunities to practice in a section of law that they feel passionately about; or they may organically specialize as they handle increasingly more cases in a niche area of law.

30. When consumers search for a lawyer, they tend to seek out a lawyer that has experience, if not expertise, in the particular area in which they need legal assistance. Someone looking for a lawyer to defend a patent, for example, is more likely to retain a patent lawyer, rather than a criminal defense lawyer. Someone looking for representation following an injurious motor-vehicle accident is more likely to seek out a personal-injury lawyer rather than a patent lawyer.

31. Within the broad area of law encompassing personal injury cases, lawyers often develop special competence in certain types of personal injury, because the issues, causes of action, and standards of care can differ. In a products liability personal injury case, for example, causes of action could sound in a design defect, a warning defect, or a breach of a warranty; and the standard for liability tends to be strict liability. In a premises liability case, by contrast, the cause of action tends to be negligence. The scientific and medical knowledge, and the types of experts, needed to litigate different personal injury cases differ too. A products liability case could require in-depth knowledge of materials engineering, and an expert in, for example, a particular type of metal. In motor-vehicle personal-injury cases, lawyers must have a deep understanding of physiology, kinesiology, accident reconstruction, and trauma care.

32. Some lawyers, of course, may develop experience in multiple areas of law, especially multiple areas of personal-injury law. But the fact remains: a motor-vehicle accident victim will seek out an attorney with experience in motor-vehicle accidents—not patent law, not criminal defense, not even products liability or premises liability.

33. The same holds true for attorneys looking for employment, and firms looking to employ them. Those attorneys seek out employment in specific areas of law—either because they are interested in that area of law (early in their career), or because it is an area of law in which they have marketable expertise (as their career progresses). When a lawyer leaves a personal-injury

firm, they can market themselves to other firms based on their experience in that area of law and based on the size of the "book of business," or number and quality of clients, that they represent. A lawyer with years of experience in patent law is unlikely to be interested in employment with a personal-injury law firm; nor is that firm going to be interested in them. But, in a properly functioning market, a lawyer with several years of experience in motor-vehicle personal-injury litigation with dozens of clients willing to follow him to a new firm would be a very competitive candidate at other motor-vehicle personal-injury firms.

34.     When searching for a lawyer to represent them in a motor-vehicle personal-injury case, clients seek out and prefer local attorneys. A California resident who is the victim of an accident in California is unlikely to hire a Florida-based lawyer to represent her, for several reasons. First, it is easier to work with a local attorney: during litigation, the client will need to meet with their attorney, provide documents to their attorney, sit for depositions at their attorney's office. This is much easier to do when the lawyer is nearby. Second, motor-vehicle personal-injury cases usually seek compensation for medical care to treat their injuries. The standards of care, and the cost for that care, vary by geographic region: an ER visit in Lexington, Massachusetts costs more than the same care in Lexington, Kentucky. An attorney familiar with local standards and costs of care is better able to advocate for the appropriateness of treatment; and more likely to accurately estimate the cost of that care and, therefore, the clients' damages. Third, the law limits where a client may bring its action, and thus the client must retain a lawyer admitted to practice in the jurisdiction in which the client sues.

35.     Likewise, an attorney seeking to leave a motor-vehicle personal-injury firm to seek employment at another is often limited by their geography. Since lawyers may only practice in jurisdictions to which they have been admitted, lawyers must seek employment within those

jurisdictions—or else endure the headache of gaining admission to that jurisdiction's bar. These limitations on the portability of a law practice tend to mean that attorneys remain within their established geographic area; this is particularly true the longer the lawyer has been practicing (and the longer it has been since that lawyer took a bar exam). Accordingly, a motor-vehicle personal-injury attorney admitted in, for example, Indiana, will seek employment from, or establish his own practice in, a motor-vehicle personal-injury firm within Indiana or in a bordering metropolitan area such as Louisville, Kentucky.

36. The relevant geographic antitrust market here, thus, is greater Kentuckiana. Kentuckiana is a portmanteau used to describe the geographic, commercial, and cultural region comprising western Kentucky and southern Indiana. Greater Kentuckiana, for purposes of this Complaint, is defined as Kentuckiana, along with the adjacent regions of southwest Ohio and Western Tennessee. For purposes of legal services, many motor-vehicle personal-injury attorneys in greater Kentuckiana are admitted to multiple state's bars within the region. Isaacs' CEO and founder, Darryl Isaacs, who flamboyantly calls himself the "Kentucky Hammer," is admitted in Kentucky, Indiana, and Ohio. Other lawyers within the firm are similarly admitted throughout Kentuckiana and surrounding states.

37. Mr. Alexiou is admitted to practice in Indiana and Kentucky. That means his practice area is wholly subsumed within the bounds of the relevant geographic market.

38. The market for motor-vehicle personal-injury attorneys' services in greater Kentuckiana is dominated by a few behemoth, volume-based practices. Among them is Isaacs. These firms tend to attract clients based on name recognition. They often rely upon road-side billboard advertisements along Interstate 65 or regionally specific ads on daytime TV. Because of the large number of settlements facilitated by these firms, they can tout large aggregate sums of

money recovered on behalf of clients, without stating anything about the favorability or size of recoveries for individual clients. For example, on billboards across greater Kentuckiana, Darryl Isaacs poses with an oversized hammer next to claims of recovering "billions of dollars":



39.     The lawyers featured on these billboards do not handle every case, which would be impossible at such a volume. For example, the above Isaacs billboard—in tiny letters too small to be read when driving past—discloses "Services may be performed by other attorneys." But because of investments in advertising, these shops enjoy broad name recognition, often purchasing catchy website names or easy-to-remember phone numbers. They may also pay substantial sums to search engines, like Google, to influence their search algorithms to ensure those searching for a motor-vehicle personal-injury attorney see their site first.

40.     Up against these well-resourced, volume-based practices, smaller firms and solo practitioners providing motor-vehicle personal-injury attorneys' services have few options to compete. There are two principal means of competition available to them: competition on price, or competition on quality of services.

41.     First, price. Motor-vehicle attorneys typically represent clients on a contingency-fee basis. This means the client does not pay a fee to the attorney unless and until the attorney recovers from the defendant. Generally, the attorney covers all the costs of litigation and bears all the risk of not recouping those costs in the event no fee is recovered. If a litigation results in a settlement or an award, the lawyer is then entitled to a fixed percentage of the recovered fee.

42.     A motor-vehicle personal-injury attorney seeking to compete in the market dominated by large, volume-based practices like Isaacs may compete on price in several ways. They may compete by taking a lower percentage of the eventual award, offering staggered contingency fee arrangements depending on when settlement occurs, and by waiving interest on advanced costs, while others do not.

43.     Second, quality. Motor-vehicle personal-injury attorneys in greater Kentuckiana may compete by providing a higher quality of service. As described above, motor-vehicle accident victims search for lawyers during periods of intense vulnerability and must share invasive and traumatic personal details with their attorney. Attorneys who can form meaningful relationships with their clients, bear the emotional weight of the work, support their clients, and translate those facts into a respectful and compelling story for a factfinder are hired at a premium. Accordingly, motor-vehicle personal-injury attorneys may compete based on their reputation and ability to connect with their clients.

44.     Indeed, for many motor-vehicle personal-injury attorneys who are entering the market as solo practitioners or in new partnerships for the first time, it is likely the case that their ability to relate with clients is their strongest means of competing. A new motor-vehicle personal-injury attorney in the market cannot hope to carry the name recognition of the Kentucky Hammer. They cannot yet tout the kinds of aggregate recovery that are assured by a long and successful

tenure in the legal field. And they are unlikely to command a small, constantly changing army of hard-working younger lawyers to litigate for them. But they can absolutely trade on their reputation for compassion, service, persistence, and zeal.

**C.     Both Lawyers And Clients Are Entitled To, And Do, Move Among Law Firms Within The Market For Motor-Vehicle Personal-Injury Attorneys' Services In Greater Kentuckiana.**

**1.     Attorneys may change firms to advance their careers or seek a better work environment, and their former firm may not interfere with their movement.**

45.     The Kentucky Bar Association issues ethics opinions to provide guidance to attorneys in adhering to the Rules of Professional Conduct. In KBA Ethics Opinion E-424, the KBA recognized that traditions within the legal profession have changed. No longer is it customary or expected that an attorney will finish their career at the same firm where they began.

46.     Any number of factors might motivate an attorney to leave their current employer and seek their fortune elsewhere. These include, *inter alia*:

- Toxic or incompetent management;

- Inadequate appreciation for work performed;

- Insufficient compensation;

- Poor workplace culture;

- Lack of advancement opportunities; and/or

- Philosophical differences with decisionmakers with respect to practice strategy.

47.     In the motor-vehicle personal-injury attorney market, it is not uncommon for attorneys to build a book of business with an established firm—making a significant amount of money for the firm in the process—before they ultimately decide to test the waters on their own as a solo practitioner or in a smaller partnership.

48. Deciding to leave a large firm carries both risks and rewards for motor-vehicle personal-injury attorneys. On the one hand, the attorney will receive a larger percentage of any fees recovered. And, they begin the life-long journey of building goodwill both as a motor-vehicle personal-injury attorney and as a member of their local business community. However, the attorney will now bear the expense of all direct and indirect costs, and the risk that those costs will not be recovered if a suit is unsuccessful. They will also inherit the challenges intrinsic to business ownership, such as affording overhead; staff; office-space; the costs of maintaining liability insurance, their bar license, and continuing legal education compliance.

49. These risks can be mitigated somewhat if an attorney is able to build and bring with her a strong book of business—a stable of clients for whom they have worked in prior employment, and who value the quality of services that attorney provided. If an attorney chooses to go out on his own in a solo practice or small partnership, having clients elect to continue with his representation assures the departing attorney has a source of income and start-up funding for his new business. If that attorney instead elects to join another firm, that book of business, and promise of profitability soon after commencing employment, increases the attractiveness of his candidacy.

50. Being a lawyer is a profession. It is governed by rules of ethics and, in greater Kentuckiana, by standards of professionalism that aim at ensuring not only fairness to clients, but professionalism among lawyers. As a result of these rules the process of departing one's old firm *should* be as professional, painless, and ethical as possible. Attorneys should be able to separate from an old firm in favor of new employment in a manner that promotes competition in the market for motor-vehicle personal-injury attorneys services, both for clients seeking services and attorneys seeking employment.

**2.    When attorneys leave or change firms, clients may choose to follow them, and the rules of ethics forbid lawyers from interfering with a clients' choice of counsel.**

51.    KBA E-424 acknowledges that this movement of attorneys from firm to firm creates ethical questions and imposes ethical obligations to ensure that the practice of law is not unduly constrained and that clients' choice of representation is respected.

52.    As the Opinion notes: "At the time of a break-up, it is very likely that the departing lawyer will view certain current clients as 'his,' and the firm will regard the same clients as 'firm clients.' Irrespective of how the departing lawyer or the firm views a particular client, the client is not property and does not 'belong' to anyone."

53.    Given this backdrop, clients must be notified when an attorney who has played a significant role in delivering services to the client is departing and must be notified of their right to determine who will represent them. These letters to clients are colloquially termed "election letters." Per Ethics Opinion KBA-E424, the duty to notify "arises from the lawyer's duty to keep the client reasonably informed under SCR 3.130-1.45 and the client's right to counsel of his or her own choosing, as reflected in SCR 3.130-1.16 and 5.6."

54.    This requirement is not unique to the practice of law in Kentucky. The Indiana Bar recognizes that the "departure of a lawyer from a firm is often fraught with emotion[.]" The Indiana Disciplinary Commission has expressly stated that the best practice is for the firm and the departing lawyer to agree on language and send a joint communication to the client. *Navigating a Lawyer's Departure from a Law Firm*, Disciplinary Comm'n Op. 125, available at https://www.in.gov/courts/ojar/files/dc-opn-1-25.pdf. The Ohio Board of Professional Conduct offers similar guidance, recognizing that it is common for attorneys to change firms and emphasizing the importance of protecting client choice when such moves occur. *Switching Firms,*

15

*Ohio Ethics Guide*, Ohio Bd. of Prof'l Conduct (2017) (available at https://544c0861-b216-4524-b3df-27c05c4d0e47.filesusr.com/ugd/c6a571_e7673b18089f41a0b9ca9ee8a3ed5ffe.pdf).

55.    Thus, all states in the Greater Kentuckiana area are in accord with respect to obligations placed on both firms and departing attorneys.

56.    When an attorney such as Mr. Alexiou departs a firm where he has personally handled dozens of active matters, it is reasonably expected that a substantial number of those clients will elect to continue with that attorney, whether at a new firm or in a solo practice, once they are informed of their rights and his new affiliation. The economic value of an attorney's book of business in such situations consists largely of the fees that will be earned if, as is typical, many existing clients elect to maintain their relationship with that attorney at his new firm.

**3.    While an attorney's former firm may be entitled to compensation for its contributions to the case, the ethics rules forbid an unreasonable fee split.**

57.    The Rules of Professional Conduct governing all attorneys in Kentucky permit attorneys from different firms to share fees only where "(1) the division is in proportion to the services performed by each lawyer, or, each lawyer assumes joint responsibility for the representation; (2) the client agrees to the arrangement and the agreement is confirmed in writing; and (3) the total fee is reasonable." SCR 3.130 1.5(e).[2] Where an attorney leaves a firm, however, it is permissible for the former firm to receive a share of fees on cases that is proportional to the amount of work performed by the attorney while employed at the firm. *See* Comment 8 to SCR 3.130 1.5(e).

58.    Where an attorney's employment agreement purports to assign a uniform percentage to all client matters upon separation of employment, it cannot possibly reflect an

---

[2] Ohio and Indiana both possess rules governing fee sharing that are identical in all material respects.

accurate assessment of the work performed by the prior firm. Such agreements run afoul of a strong public policy against restricting the right of attorneys to practice after departing their current firm, particularly where the agreements demand a significant percentage of future fees recovered. The public policy at issue is located at SCR 3.130 5.6.

59.     While fee splits that are overly generous to the original firm do not expressly restrict an attorney's right to practice in a geographical area or for a set period of time, they create financial realities that make it impractical or unviable for the departing attorney to continue representation, a matter which directly interferes with the client's choice of counsel. Moreover, employment agreements can further interfere with a departing attorney's ability to represent their current clients by creating other financial penalties such as so-called client acquisition fees or liquidated damages provisions. The impact on a departing attorney is significant. An overly encumbered book of business can risk the viability of a new law firm. The threat of litigation could have a chilling effect on the attorney's decision-making, and the expense of litigation is yet another unanticipated cost to the burgeoning practice.

60.     Further, the improper fee splits act to interfere with third parties, such as other motor-vehicle personal-injury law firms who would otherwise be interested in employing the departing attorney. Improper and unbalanced fee splits make offering employment and accepting the attorney's accompanying new clients a liability for such law firms, rather than a positive aspect of the hire. Improper fee splits therefore place an improper restraint on other motor-vehicle personal-injury law firms' ability to freely operate their businesses.

61.     Put another way, such fee splits prevent competition in the market for motor-vehicle personal-injury attorneys' services. A lawyer seeking to strike out as a solo practitioner cannot adequately fund his fledgling endeavor if the majority of his earnings on the cases of clients who

17

followed him must be remitted to his old firm. This decreases the likelihood that an attorney could open a new competing law firm in the relevant market. And a lawyer seeking employment with a new firm is a far less appealing candidate if, for example, 70% or more of the fees he earns on his portable cases are taken from his new employer by his former employer. This not only decreases the attorney's viability as a candidate for employment, it decreases the success of firms that do hire him or her.

62. Thus, disproportionate fee splits directly impact motor-vehicle accident victims' right to the representation of their choosing, and constrain the ability of motor-vehicle personal-injury attorneys to enter or compete in the market.

63. In a recent opinion, the Kentucky Court of Appeals invalidated an agreement which purported to universally assign a seventy-five percent value to all clients irrespective of the amount of work performed. *Franklin v. Emery Law Office, Inc.*, 2023-CA-0586-MR, 2024 WL 2788214 (Ky. App. May 31, 2024). The Court held that the Agreement violated SCR 3.130 5.6. The relevant portion of that agreement reads:

> Law firm acknowledges that should Employee's employment relationship with Law Firm terminate, there may exist instances where clients of the Law Firm may choose to continue to be represented by the Employee. As for contingency fee cases where a client of the Law Firm chooses to continue representation with the Employee, upon severance of the employment of the Employee, whether voluntary or involuntary, Employee expressly acknowledges and agrees that the Law Firm shall be entitled to payment of Seventy-Five percent of the contingency fee earned by Employee together with the repayment of all costs expended by the Law Firm prior to Employee's departure. The purpose of each agreement is to avoid disputes requiring time-consuming Quantum Meruit analysis or necessitating the involvement of clients and/or insurance adjusters which could in turn delay the settlement or distribution of settlement funds of a case.

2024 WL 2788214, at * 1.

18

64.     Moreover, in 2015, a lawyer was disciplined both by Indiana and Kentucky for requiring his employees to sign similar agreements then suing them when the employees attempted to notify clients of their departure. *See In re Truman*, 7 N.E.3d 260 (Ind. 2014) & *Kentucky Bar Ass'n v. Truman*, 457 S.W.3d 325 (Ky. 2015).

**D.     Mr. Alexiou Worked For Isaacs For 4 Years And Obtained Favorable Results For His Clients; Many Clients Wished To Keep Him As Their Lawyer Upon His Departure.**

65.     Mr. Alexiou graduated from the University of Louisville Brandeis School of Law in 2020. After law school, he took the Indiana state bar, gained admission, and spent 9 months as a deputy prosecutor in Harrison County, Indiana.

66.     Mr. Alexiou felt called to serve as many people as he could with his law degree. This, coupled with his aptitude for negotiation and interpersonal communications, led him to pursue a career as a motor-vehicle personal-injury attorney.

67.     In or around April 2021, he accepted an offer of employment at Isaacs; he began practicing there on April 5, 2021. During his tenure, Isaacs required Mr. Alexiou to sign increasingly less favorable employment agreements to continue his employment.

68.     For example, when Mr. Alexiou began his employment, he was entitled to 20% of all attorneys' fees recovered on behalf of his clients. By the time he departed, he was entitled to only 15%. This reduction occurred despite Mr. Alexiou having four additional years of directly relevant experience and higher recoveries on behalf of his clients and the firm each year. As the profits for the firm rose from Mr. Alexiou's efforts, Isaacs responded by reducing Mr. Alexiou's compensation year over year. While each contract included minimal raises to Mr. Alexiou's base salary, the majority of his compensation came from his portion of the fees recovered. Thus, Isaacs' pay scheme negatively impacted his overall compensation every time it unilaterally reduced Mr. Alexiou's portion of the fees.

69.     When Mr. Alexiou began his employment with Isaacs, he immediately found success, at least with respect to client outcomes. Clients were happy and Isaacs profited handsomely from Mr. Alexiou's labors.

70.     Isaacs was not shy in sharing Mr. Alexiou's successes with the world via the firm's Instagram page. On March 28, 2025, Isaacs posted a five-star review from a client named Honey Bee that states: "I'm extremely happy that Nicholas Alexiou is my attorney. He did a fantastic job with my case and I highly recommend if you are looking for an attorney, this is the guy you need to settle your case. Thank you so much Nick, I appreciate your hard work."

71.     Similarly, on December 28, 2024, Isaacs shared another five star review, this one attributed to Amanda Patton. "Nick Alexiou helped us settle our case. He was wonderful. He didn't pressure us into anything. He gave us solid advice and explained things throughout the whole process. Thank you so much for all your help and hard work Nick!!!"

72.     But from the outset, Isaacs was a difficult working environment. The Kentucky Hammer often relentlessly pressured attorneys to settle cases; other times he would push attorneys to carry cases to trial despite client doubts based largely on the Kentucky Hammer's ego. Isaacs' system for bonus compensation disincentivized pre-litigation attorneys from settling cases prior to filing suit. For example, at the time of Mr. Alexiou's departure, he was not permitted to settle cases without approval of non-lawyers whose sole focus was pushing cases to trial. This happened even when Mr. Alexiou and his client thought settlement was in the clients' best interests, and sometimes to a client's detriment, to seek larger jury verdicts to advertise on billboards.

73.     Additionally, the Kentucky Hammer promoted a toxic workplace culture. Secrecy was one weapon of choice. The Kentucky Hammer threatened attorneys against discussing the terms of their compensation with one another.

74.     As just one example, on September 23, 2023, the Kentucky Hammer sent an email with the subject line "Confidential" to all attorneys. The email states:

> I want to inform you have [sic] a couple of things. First, I want to remind each and everyone [sic] of you not to discuss your compensation with anybody or anyone.
>
> Second, I am hiring an Indiana litigation attorney, and all new attorney hires are not coming in at both pre lit snd [sic] lit are the same percent as you currently have and if I find anyone discussing this with anyone it is grounds to be automatically terminated.

75.     The fact that the email framed the warning as "a reminder" shows how pervasive the aura of secrecy was as well as how important it was for the Kentucky Hammer to silo his attorneys and keep them in the dark to the extent possible about the terms and conditions of their colleagues' employment.

76.     As an attorney, the Kentucky Hammer should know that it is a violation of Section 7 of the National Labor Relations Act to prohibit employees from discussing the terms of their employment. Prohibiting attorneys from understanding the scope and scale of opportunities available to them at Isaacs prevents them from assessing whether more competitive employment may be found elsewhere. Put bluntly, it can inhibit growth of competition in the market for motor-vehicle personal-injury attorneys' services in the greater Kentuckiana region.

77.     Like many motor-vehicle personal-injury attorneys, employees of Isaacs were required to enter into employment agreements. Mr. Alexiou was in fact required to enter into a number of agreements. Unfortunately, these contracts became increasingly more restrictive over time. Isaacs ultimately required Mr. Alexiou to enter into an agreement which went beyond the realm of mere disincentives should he opt to take cases with him. Instead, the agreements devalued his book of business such that serious questions arose as to whether it was tenable for him to even offer his clients the opportunity to stay with Mr. Alexiou in the event he left.

21

78.     It became apparent to Mr. Alexiou that the Kentucky Hammer was growing increasingly more unreasonable, and the terms of his future employment were unacceptably uncertain. Mr. Alexiou concluded that the working environment at Isaacs could not provide the security he needed to justify the energy he was investing in his job. As a result, Mr. Alexiou found employment with a new law firm, Alex R. White, PLLC.

79.     In the spring of 2025, Mr. White met with  Mr. Alexiou and was favorably impressed with him personally as well as Mr. Alexiou's credentials and experience.

80.     Unfortunately, however, Mr. White was aware of Isaacs' unconscionable fee split arrangements. Thus, Mr. Alexiou's approximately ninety clients, which would have otherwise been an impressive book of business, became instead a very real potential liability. Why? Because the fee split favored Isaacs so much that Mr. White was concerned that, as written, he would lose money on the portable business. But on top of that, Mr. White knew the Kentucky Hammer had already sued two former associates, and Mr. White was rightfully deeply concerned about the tolls of potential litigation, regardless of how baseless any claims might be.

81.     Despite his serious reservations relating to potential fallout with Isaacs, Mr. White viewed Mr. Alexiou as a potentially valuable member on his team and ultimately decided to hire him in spite of his reservations.

82.     On leaving Isaacs, Mr. Alexiou attempted to send election letters to the clients whose cases he was actively handling at the time of his departure. He was only able to contact approximately fifty of his approximately ninety total clients. Of those fifty, virtually all elected to continue representation with Mr. Alexiou.

83.     Before Mr. Alexiou could send election letters to the remaining clients, Isaacs shut Mr. Alexiou out of its system, rendering it impossible for Mr. Alexiou to contact his remaining clients to allow them to state their choice of counsel moving forward.

84.     On information and belief, Isaacs then sent a defamatory election letter to all of Mr. Alexiou's clients insinuating that he had been fired from the firm- rather than having left of his own volition – to prevent clients from continuing their representation with Mr. Alexiou.

85.     Isaacs stole from approximately forty individual clients the right to make an informed choice as to who would represent them.

86.     Had Mr. Alexiou been allowed to communicate directly with these clients consistent with Kentucky and neighboring states' ethics rules, many of them would have elected to remain with him, and Plaintiffs would have earned contingent fees on those matters.

**E.      Isaacs Engages In An Overarching Anticompetitive Scheme To Punish Attorneys That Leave Its Firm.**

    **1.      Isaacs bullies its attorney employees into signing anticompetitive employment agreements that frustrate the attorneys' ability to change law firm affiliations and penalize those that do.**

87.     Mr. Alexiou signed a final employment agreement with Isaacs on December 11, 2024. The Agreement begins by stating that the Attorney will "perform all work and services in an ethical manner and agrees to comply with all applicable statutes, regulations, disciplinary rules, and ethical considerations." (Agreement at ¶ 1). But, as became clear, the terms of the Agreement itself would result in Mr. Alexiou violating his ethical duties as an attorney in Indiana.

88.     The majority of the remaining terms spell out the compensation model for Mr. Alexiou as an employee at Isaacs. The end of the agreement, however, contains provisions applicable to Mr. Alexiou's departure. One such provision states as follows:

> If this Agreement is terminated by Attorney or Isaacs, and Attorney continues to represent clients who were active Isaacs clients, at the

> conclusion of each said clients' [sic] case and immediately after each settlement or award/fee is paid, Isaacs and Attorney shall agree the reasonable attorney's fee due Isaacs shall be seventy percent (70%), of the attorney's fee portion on said case recoveries. Attorney acknowledges said percentage to Isaacs is a reasonable attorney's fee allocation to Isaacs. Attorney agrees that Isaacs shall be entitled to notification, distribution, and accounting of any such recoveries to the same extent as the client pursuant to SCR 3.130(1.15), and Attorney shall provide Isaacs status updated on any such pending cases on a quarterly basis beginning the date of the Attorney's termination under this Agreement. Attorney acknowledges that Isaacs may file, at its election, a Notice of Attorney's Lien of record and/or on opposing counsel, insurance companies and such other persons necessary to assert said lien. Attorney further acknowledges Isaacs may file, at its election, a statutory lien and/or a consensual lien regarding any said cases, and that the election of Isaacs not to file any such lien(s) does not constitute a waiver of any attorney's fee due Isaacs under this Agreement.

(Section 13.A).

89.     The Agreement appears to contemplate that the seventy percent across-the-board fee share to Isaacs may well be held unenforceable at some point. This is a good prediction given that Indiana had already held that such fee split arrangements violate the ethical rules governing attorneys in Indiana at the time Isaacs bullied Mr. Alexiou into signing the agreement. As a result, the Agreement includes what amounts to a finders' fee of $6,000 for each case should the fee split have to be determined based on a quantum meruit evaluation:

> The parties agree that in the event it must be assessed for quantum meruit, for any reason, Isaacs is entitled to an equitable allocation based on the cost of acquisition of cases in a competitive market. This sum shall be quantified in a schedule entitled Case Acquisition Cost Schedule (CACS) compiled and published to Attorney by Isaacs. The CACS shall be reviewed yearly and, when updates or amendments are necessary, Isaacs shall timely transmit revised CACSs to Attorney. The CACS shall set forth the amount of marketing, intake, administrative, and other costs associated with obtaining cases within different categories (e.g., case value range, type of case). In the event of any quantum meruit determination, the parties agree that the CACS's assessment of the value of case acquisition DJN investment at the time of the assessment shall represent an equitable monetary value that shall be assessed alongside the

24

> value of attorney time and other equitable considerations for fee division.
>
> Isaacs has calculated the cost of acquisition for cases in 2024 to be $6,000.00 per case and will use this calculation for a reduction of attorney's fees owed to any separated attorney moving forward until the end of 2025 at which point the cost per acquisition of case [sic] will be re-evaluated.

(Section 13.G).

90.    The agreement also constrains Mr. Alexiou's ability to inform clients of his future employment plans by requiring that any client election notice be sent out by Isaacs and making use of the "I&I standard client election letter." (Section 12.E). Of note, Mr. Alexiou was never permitted to review the "standard client election letter" and upon information and belief, believes Isaacs and Isaacs does not send out one uniform letter when an attorney departs. In other words, the terms impede Mr. Alexiou from communicating with his still-current clients and deprives him of the ability to shape what clients are told. Yet the agreement still gives Isaacs and Isaacs carte blanche authority to attach Mr. Alexiou's signature, (Section 12.F), allowing Isaacs to imply to clients that Mr. Alexiou agrees with the firm's representations in that letter.

91.    The Agreement contains a liquidated damages provision requiring that, in the event any breach of the election notice provisions occurs, the non-breaching party is entitled to $8,000 per breach, irrespective of the client's ultimate decision. In other words, a departing attorney could fail to follow every requirement of the client election provisions, the client could elect to remain with Isaacs, but under the Agreement, the departing attorney would nonetheless owe Isaacs $8,000.

92.    In the event of a dispute over fees, the Agreement requires the departing attorney to remit any disputed fee to a trust account held by Isaacs.

93.    And, the Agreement contains a binding arbitration provision purporting to require disputes under the agreement to be arbitrated before the American Arbitration Association.

**2.    Isaacs strategically enforces its anticompetitive employment agreements to disincentivize attorneys from leaving the firm.**

94.    When the Kentucky Hammer presented his attorney employees with this take-it-or-leave-it agreement, one long-time employee requested the weekend to discuss it with his spouse. On information and belief, when that employee returned to work Monday, he learned the Kentucky Hammer had not bothered to wait for his answer and had instead fired him.

95.    On information and belief, Isaacs took such drastic action against a long-time employee to make an example out of him for the other attorneys. If Isaacs would fire a dedicated attorney simply for taking time to consider the agreement, what choice did anyone else have other than to sign?

**3.    Isaacs brings anticompetitive sham litigation against attorneys that dare leave to pursue better employment options.**

96.    Following Mr. Alexiou's departure from Isaacs, he began receiving correspondence threatening him with litigation relating to his departure. In one text message sent at 4:08 pm May 2, 2025, Isaacs' Chief Operating Officer Cheyne Jackson asked, "did you resign?" When Mr. Alexiou did not immediately answer, Mr. Jackson wrote again at 5:13 pm: "Nick, please be aware we will enforce the contract. Including the 8K liquidated damages per case for violating the disengagement section."

97.    Meanwhile, the Kentucky Hammer contacted Mr. White directly. Mr. White was both reasonable and wanted to avoid conflict. Notwithstanding the unethical nature of the Agreement, Mr. White is an attorney and knows well how quickly litigation over such matters can become a no-win scenario. Shortly after Mr. Alexiou put in his notice with Isaacs, the Kentucky Hammer reached out to Mr. White. Via a text message to Mr. White sent at 11:04 am on May 2, 2025, the Kentucky Hammer wrote:

26

> Hey Alex we've had a good relationship and I've even sent you business and I've even tried to give you some advice and share stuff. I don't know if this is true or not but not sure if Nick Alexiou is coming to work for you but he left yesterday with no notice. At this point, it is going to be hard to have any relationship with you whatsoever.

In other words, the Kentucky Hammer attempted to threaten a competitor firm into rescinding Mr. Alexiou's offer of employment in order to thwart Mr. Alexiou's—and Alex R. White, PLLC's—ability to compete with Isaacs.

98.    Mr. White responded, offering to remit to Isaacs the proportion of revenue demanded in Isaacs' unlawful contract with Mr. Alexiou, and indicated that he hoped this would prevent Isaacs from taking retaliatory action against Mr. Alexiou or Alex R. White PLLC. That is, even though the contract was anticompetitive and a violation of Kentucky ethics rules, Mr. White felt obligated to accede to Isaacs & Isaac's demand, given its prominence and power in the market for motor-vehicle personal-injury attorneys' services. Mr. White wrote:

> Oh man I hope not. He's best friends with one of our lawyers and I know you've got some changes going on that you guys are working through but it is creating turnover: he was going to leave regardless. But he will follow your contract and ensure you get paid the full 70% of anything settled.

Two things are relevant about Mr. White's response. First, Mr. White offered Isaacs full satisfaction of its contractual rights—which would obviate the need for Isaacs to sue. And he made that offer long before Isaacs filed suit against Mr. Alexiou.

99.    Second, Mr. White's response suggests that it was known that Isaacs' ever-changing and worsening terms of employment were causing attorney attrition. In a properly functioning market, grossly unfavorable employment terms would lead to attrition from that firm and an enhanced ability of competing firms to compete. But Isaacs wanted to be able to impose

27

anticompetitive, unethical, and grossly unfair employment terms on its employees without consequence.

100.    Mr. White's offer to follow the letter of the Agreement, and Isaacs and Isaacs defamatory letters and locking Mr. Alexiou out of the system so that he could not contact all of his clients, were not enough for the Kentucky Hammer. He then countered with an unjustifiable and frankly bizarre demand for ninety percent of Mr. Alexiou's fee recoveries. This conduct establishes Isaacs' anticompetitive intent to interfere with competition by either (a) threatening to bring an objectively meritless litigation to harm competitors and/or (b) keeping nearly all fees recovered in order to further harm Mr. Alexiou's ability to compete in the market for motor-vehicle personal-injury attorneys' services in greater Kentuckiana.

101.    Eventually, Isaacs served Mr. Alexiou with a lawsuit styled *Isaacs & Isaacs v. Alexiou*, No. 25-CI-004353 (Jeff. Cir. Ct. 2025).

102.    Despite Mr. Jackson's threat to sue for breach of contract and exercise Isaacs' purported contractual rights, the lawsuit does not plead breach of contract. Instead, it brings claims for breach of fiduciary duty and tortious interference with a contract: namely, the fee agreements between Mr. Alexiou's clients and Isaacs. Upon information and belief, Isaacs did not attempt to enforce its anticompetitive contractual terms, because it knew or had reason to know that they would be struck down as unconscionable, and as potential ethics violations.

103.    Mr. Alexiou retained counsel at significant expense. He found himself five years out of law school, finally establishing himself as a motor-vehicle personal-injury attorney, only to find his life upended as well as his finances, his job, and his reputation under threat from the biggest bully in the schoolyard, Darryl Isaacs.

28

104.    After Mr. Alexiou moved the Court to dismiss Isaacs' claims, Isaacs amended its complaint to add Alex R. White, PLLC as a co-defendant.

105.    Nor are Mr. Alexiou and Mr. White alone victims in Isaacs' efforts to restrict competition in the Greater Kentuckiana motor-vehicle personal-injury attorney market. Upon information and belief, the Kentucky Hammer has sued as many as five former attorneys and the firms they went to work for, all within the past eighteen months. Isaacs sued two former attorneys and their new firms before filing suit against Mr. Alexiou, and has sued two more since. The relevant cases include: *Isaacs & Isaacs PSC v. Astorino*, No. 25-CI-002849 (Jeff. Cir. Ct.); *Isaacs & Isaacs PSC v. Haynes*, No. 24-CI-006840 (Jeff. Cir. Ct.); *Isaacs & Isaacs PSC v. Scott*, No. 26-CI-3684 (Jeff. Cir. Ct.); and *Isaacs & Isaacs PSC v. Tackett*, No. 25-CI-8787 (Jeff. Cir. Ct.).

106.    On information and belief, at least one attorney simply accepted Isaacs' anticompetitive assault on her freedom to seek new employment and abandoned her entire book of business in order to avoid the fallout and inevitable lawsuit against her new employer. There are likely others who made the same decision.

107.    Isaacs' lawsuits constitute sham litigation under the Supreme Court's holding in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993), because they are objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits of their claims. These actions instead conceal attempts to interfere directly with business relationships of competitors through use of governmental process, as opposed to the outcome of that process, as an anticompetitive weapon.

108.    Isaacs' lawsuit against Plaintiffs, and specifically the amended complaint adding Alex R. White, PLLC, alleges through barebones recitation that Mr. Alexiou is liable to Isaacs for breach of fiduciary duty, that Alex R. White PLLC is liable for "aiding and abetting breach of

fiduciary duty," that both are liable for tortious interference with client contracts, that Mr. Alexiou is liable for breach of contract, and that Alex R. White, PLLC is liable for tortious interference with Mr. Alexiou's employment contract. Finally, Isaacs sets forth claims of the elements of promissory estoppel and quantum meruit.

109. These claims are objectively baseless. First, Mr. Alexiou was an associate with Isaacs. Under Kentucky law, an employer-employee relationship does not give rise to a fiduciary obligation on the part of the employee. *Aftermarket Tech. Corp. v. Whatever It Takes Transmissions*, 2003 U.S. Dist. LEXIS 27933 (W.D. Ky. Aug. 13, 2003). The nonexistence of a fiduciary duty is fatal to the purported claim of "aiding and abetting" the breach of fiduciary duty leveled against Alex R. White, PLLC.

110. Further, it accuses Alex R. White, LLC of tortiously interfering with Mr. Alexiou's employment contract, but alleges no facts to support such contention. Indeed, Mr. White's communications with Isaacs make it clear he intended to honor the only portion of Mr. Alexiou's employment contract that was applicable to Mr. White, *i.e.*, the unethical fee split arrangement.

111. Isaacs' allegation that Mr. White "interfered" with Mr. Alexiou's employment contract is further evidence of the Kentucky Hammer's distorted view of himself as the king of motor-vehicle personal-injury in Kentucky to whom all other attorneys and law firms must pay fealty. It is particularly galling considering Mr. White's initial unhesitating willingness to pay Isaacs its unreasonably high fee share in the interest of prompt resolution. Put simply, that's not how a robust free market works. Isaacs is not allowed to force its associates into unconscionable employment agreements, then sue them when they exercise freedom of movement and go to another firm. The chilling effect on lateral movement is obvious, and the downstream consequences significant.

112.    The same is true for Isaacs claim that Mr. Alexiou and Alex R. White, PLLC, interfered with client contracts by sending election letters. Mr. Alexiou sent his clients ethically sound election letters, and most of the clients decided to stay with him. Under Isaacs' read of the law, any attorney who leaves his employment and sends election letters to their clients from their new firm would be liable for tortious interference should the clients choose to stay with them. This is an absurd outcome that the law does not countenance.

113.    Additionally, the suit is factually baseless where it alleges that Mr. Alexiou slowed down the pace of his work to the detriment of his clients in his last half a year at Isaacs. This is a meritless contention. As Isaacs' own advertising shows, Mr. Alexiou was receiving high praise from his contemporaneous clients, praise on which Isaacs was more than happy to trade as advertisement for its services.

114.    But that's because Isaacs' lawsuits are not about obtaining the stated ends set forth in the complaint. Instead, they are intended to harm the competition, to restrain trade, to improperly chill the lateral mobility of Isaacs' employees, and to harass and intimidate. They hinder the departing employees' employment prospects and impair their freedom to move freely from job to job, because a brand-new or potential future employer will likely be much less willing to incur the hassle, risk, and uncertainty of hiring an employee who is a defendant in a lawsuit. They drain the departing employees' financial resources that could be better put to establishing their own firm. And they serve as an implicit threat to Isaacs' current employees, a foreshadowing of what will happen if they seek to leave the firm and their clients choose to follow them.

115.    Isaacs' intent to use lawsuits as an anticompetitive weapon, rather than as a means to secure its contractual rights, is apparent from two further texts  the Kentucky Hammer sent to

31

Mr. White in the same conversation referenced above. The Kentucky Hammer made clear he was going to sue Mr. Alexiou, regardless of whether he adhered to his contractual obligations:

> He broke our contractor [sic] and we have this in writing and he contacted our clients before we both did. We have it in writing and are prepared to sue him.

The Kentucky Hammer quickly followed this threat with an unfounded and unsubstantiated threat to report Mr. Alexiou to the ethics authorities: "We are also looking into ethical violations."

116.    Nothing Mr. Alexiou did during or subsequent to his employment at Isaacs violated any rule of ethics. Rather, Isaacs' principal's threat is evidence of the firm's attempt to interfere with Mr. Alexiou's future employment prospects and his ability to compete with Isaacs in the market for motor-vehicle personal-injury attorney's services in greater Kentuckiana.

117.    Mr. White wrote back again, imploring the Kentucky Hammer to allow "level heads" to "prevail," and to work out any dispute, rather than suing. They did not. Instead, the Kentucky Hammer responded:

> For the record, in the past years, I had one of your attorneys reach out and I did not entertain anything. We are going through changes but for the better. Well, just know you are on notice of what we have going on.

This message is further evidence of Isaacs' anticompetitive intent: the Kentucky Hammer states that he refused to hire an Alex R. White, PLLC employee, implying that he expected the same courtesy in return. An agreement between employers not to hire one another's employees would be—if it existed—an anticompetitive agreement in restraint of trade known colloquially as a "no-poach agreement." Through this message, the Kentucky Hammer attempted to add yet another element to Isaacs' already expansive anticompetitive scheme: an anticompetitive allocation of the market for motor-vehicle personal-injury attorneys' services in greater Kentuckiana.

118.    Because Isaacs' lawsuit against Mr. Alexiou (like its suits against other departing employees) constitutes sham litigation, it does not enjoy the First Amendment immunity afforded to legitimate lawsuits under the *Noerr-Pennington* doctrine. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965).

**F.    Isaacs' Anticompetitive Scheme Thwarts Competition In The Market For Motor-Vehicle Personal-Injury Attorneys' Services In Greater Kentuckiana.**

119.    The impact of Isaacs' anticompetitive employment agreements on an employee's ability to leave the firm, and consequently the agreements' impact on the competitive marketplace for motor-vehicle personal-injury attorneys in Kentuckiana is significant and multi-faceted. The seventy percent share to Isaacs, apart from violating the ethical rules governing the practice of law, makes it untenable for a departing attorney to take any but the most high-value cases. For attorneys like Mr. Alexiou who represent motor-vehicle accident victims whose cases most often do not proceed to litigation, the impact is devastating.

120.    Basic math tells the story. Mr. Alexiou calculated his average recovery on behalf of clients while an attorney with Isaacs to be in the neighborhood of $60,000. Under a standard forty percent contingent fee agreement, this means the total recoverable attorney fee is around $24,000. After Isaacs takes seventy percent of $16,800, Mr. Alexiou, the attorney performing the work, is left with $7,200.

121.    Moreover, motor-vehicle personal-injury cases where the injuries are more severe, unsurprisingly, typically settle for higher amounts. But as the potential value of a claim rises, the amount of expense the attorney is required to incur by way of expert witness fees, medical evaluations, and time spent working the case increases proportionally. Notably, the Agreement makes clear that the attorney is responsible not only for covering costs moving forward should the

client elect to stay with the departing attorney, but also for reimbursing Isaacs for any costs it incurred prior to the attorney's departure.

122.    So on one end of the spectrum, the seventy percent share to Isaacs is capable of discouraging attorneys from taking clients with them because the ultimate fee recovery does not provide a sustainable amount of recovery. And on the other end of the spectrum, the seventy percent share to Isaacs will dissuade attorneys from taking higher value cases with them because the increased costs makes the risk associated with taking the cases unacceptable.

123.    Further, the $6,000 "Case Acquisition Cost" is another attempt to impair competition. It ensures that, even if a departing attorney receives a quantum meruit evaluation in a particular case, the risk remains that the resulting recovery could still be less than a viable option.

124.    One measure of direct evidence of monopoly power is whether the anticompetitive behavior complained of restricts output or raises prices. Isaacs' pattern of unilaterally imposing unethical and anticompetitive agreements then selectively enforcing those agreements through sham litigation does both within the motor-vehicle-personal-injury attorney market in Greater Kentuckiana.

125.    For motor-vehicle-personal-injury attorneys wishing to leave a new firm to either join a new firm or start their own practice, bringing along a strong book of business is paramount. That is because employers view skilled workers, like lawyers, as an investment, on which they expect to see a return. And during the hiring process, that expected return can be estimated by, in part, the book of business they can bring with them. If that book of business is severely encumbered by an unreasonable fee-sharing demand, the employment candidate appears to be a less favorable investment than if that book of business were not subject to unreasonable demands from former employers. If a departing attorney wishes to start their own firm, their expected capital to

34

contribute to that investment is severely diminished if their prior employer unlawfully retains an unreasonable proportion of future earnings. The terms of Isaacs' agreement thus dissuade Isaacs' competitors from offering higher compensation to attorneys departing Isaacs, and hinder departing attorneys' ability to establish their own competing practice. The encumbrance placed on any future recovery on behalf of clients who elect to join the departing attorney is significant, and the risk that Isaacs might sue further chills competition.

126. The impact is not just felt by attorneys but affects clients as well. Clients benefit from robust competition among law firms. As explained above, law firms can compete for clients by, among other things, offering more competitive (i.e., lower) contingency. The significant stake that Isaacs purports to hold in every case discourages a departing attorney from offering a reduced contingent fee to new clients. Further, hiring law firms will more often than not simply decline clients whose fee agreements are subject to such an unreasonable claim by such an unreasonable law firm. In other words, Isaacs' anticompetitive activity artificially influences client choice, thereby restricting the provision of motor-vehicle-personal-injury attorney services in the Greater Kentuckiana market.

**G.    Anticompetitive Effects and Effects on Interstate Commerce**

127. During the relevant time period, Isaacs was engaged in providing motor-vehicle personal-injury attorneys' services in the greater Kentuckiana region. That region comprises multiple states, including Kentucky and parts of Indiana and Ohio. Thus, Isaacs was engaged in commerce across state lines.

128. During the relevant time period, Plaintiffs provided motor-vehicle personal-injury attorneys' services in greater Kentuckiana. As a result of Isaacs' illegal conduct, as described herein, Plaintiffs were restrained in their ability to provide services in the market for motor-vehicle personal-injury attorneys' services in greater Kentuckiana.

129.    During the relevant time period, Isaacs used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate travel, and interstate wire commerce.

## V.    CAUSES OF ACTION

### Count One: Attempted Monopolization In Violation Of 15 U.S.C. § 2

### (Overarching Anticompetitive Scheme)

130.    The Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

131.    At all relevant times, Isaacs possessed substantial power (i.e., monopoly power) or possessed a dangerous probability of achieving monopoly power.

132.    With the specific intent to achieve a monopoly, Isaacs attempted to acquire and/or willfully maintain monopoly power by means of restrictive or exclusionary conduct, rather than by means of greater business acumen, in order to exclude competition for motor-vehicle personal-injury attorneys' services in greater Kentuckiana.

133.    Isaacs engaged in an exclusionary conduct scheme that included, at various times, each of the following acts (among others):

- Forcing attorneys to enter into successively more anticompetitive agreements that constrained their ability to leave Isaacs for more favorable employment elsewhere, with terms that made them less appealing as employment candidates with other firms and limited their ability to build a book of business;

- Forbidding employees to discuss the conditions of their employment, in violation of Section 7 of the NLRA, in order to keep employees from learning that their employment terms were not competitive, and preventing dissatisfaction that could prompt attorneys to seek other employment and become Isaacs' competitors;

- Making examples of employees that did not immediately cow to Isaacs' anticompetitive employment terms, in order to keep other attorneys in line and scared to leave;

- Engaging in anticompetitive sham litigation to retaliate against former employees who dare leave Isaacs' anticompetitive employment environment as well as their subsequent employers, bringing objectively meritless claims with the intent to interfere with new competitors' business; and

- Threatening the new employers of departing attorneys with costly litigation in hopes of undermining and chilling the potential for Isaacs employees to move laterally.

134.   Isaacs' employment agreement with Mr. Alexiou, operative at the time he left the firm, was anticompetitive. Standing alone, it was an unconscionable and unethical agreement aimed at improperly restraining competition in the greater Kentuckiana motor-vehicle personal-injury attorney market. It was also one of a series of employment agreements with other attorneys, all with the same aim.

135.   Isaacs' practice of threatening employees not to talk about their compensation with "anybody or anyone" furthers Isaacs' anticompetitive goals. It prevents attorneys who wish to depart from obtaining competitive employment terms elsewhere, and prevents even those attorneys not looking to leave the firm's toxic workplace imminently from learning that the oppressive terms of their employment are unfavorable. To that end, the Kentucky Hammer's decision to unceremoniously terminate the employment of a long-term employee, simply because he asked for time to read the latest iteration of Isaacs' employment agreement set an example to all employees: accept these anticompetitive terms or face unemployment. This, too, furthered Isaacs' anticompetitive goals by forcing compliance with its scheme.

136.    Isaacs' suit against Mr. Alexiou and Alex R. White, PLLC was objectively baseless and motivated by a subjective desire to thwart competition in the market for motor-vehicle personal-injury attorneys' services in greater Kentuckiana. Any reasonable litigant in Isaacs' position—that is any law firm or legal professional contemplating suing a former attorney-employee for leaving the firm—would not expect to succeed on the merits of the claims. But Isaacs sued anyway, motivated by a desire to force Mr. Alexiou and Alex R. White, PLLC to defend against a meritless lawsuit; to divert funds away from developing their respective career and law practice and to their own legal defense; to make it harder for Alex R. White, PLLC to compete in the market for motor-vehicle personal-injury attorneys services in greater Kentuckiana; and to render Mr. Alexiou a less desirable employment candidate for the duration of the lawsuit (and beyond, if Isaacs' tactics cause Mr. Alexiou to lose clients).

137.    Moreover, Isaacs employment Agreement with Mr. Alexiou contained an arbitration provision. Isaacs, clearly aware of this fact, chose to omit any claim expressly arising under the Agreement in its original filing against Mr. Alexiou. Instead, Isaacs opted to bring the breach of contract claim when it amended the complaint to include Alex R. White, PLLC. This choice is indicative of Isaacs anticompetitive behavior. Failing to include the breach of contract claim in the initial filing makes the suit look all the more meritless. But what it did was ensure that the matter was not shuttled immediately into a private arbitration, which would limit Isaacs' ability to tarnish Mr. Alexiou's reputation in the public record in furtherance of its anticompetitive aims.

138.    The goal, purpose, and/or effect of Isaacs' scheme was to secure a monopoly power with respect to motor-vehicle personal-injury attorney services. The anticompetitive terms of its employment contracts with its employees, infringement on employee discussions, and culture of fear from capricious firings made it personally and financially difficult for Isaacs employees to

38

either strike out on their own to offer their services, or to join a competing firm. And Isaacs' sham litigation against those former employees who nevertheless persevered in commencing other employment not only interfered with those attorneys' ability to compete, but also stoked further fear and inertia among remaining attorneys. Upon information and belief, Isaacs hopes and intends to settle those actions through an agreement forcing its former employees, like Mr. Alexiou, to return clients to Isaacs' control, in contravention of clients' wishes.

139.    Isaacs' illegal scheme to prevent, delay, and/or minimize the success of other attorneys competing in that market enabled Isaacs to maintain a disproportionate share of attorneys' fees in the relevant market by (1) dissuading employees from leaving the firm with a book of business and (2) financially punishing those that do leave in order to reclaim the business that followed the former employees to their new endeavors.

140.    As a result of Isaacs' overarching anticompetitive scheme, Alex R. White, PLLC and Mr. Alexiou have suffered financial harm in the form of lost profits from providing services as a motor-vehicle personal-injury attorney in greater Kentuckiana. Those lost profits come in several forms. First, with respect to the clients that elected to follow Mr. Alexiou to Alex R. White, PLLC, the funds at issue are presently encumbered as a direct result of Isaacs' unreasonable fee share, refusal to accept Mr. White's offer, subsequent higher demand, and now litigation.

141.    Second, with respect to the clients whom Isaacs prevented Mr. Alexiou from sending election letters to, and to whom Isaacs sent defamatory election letters regarding Mr. Alexiou, Alex R. White, PLLC and Mr. Alexiou lost the ability to earn any attorneys' fees at all (even an anticompetitively small share of fees).

142.    Isaacs' overarching anticompetitive scheme also restricts competition. It reduces, impairs, or eliminates clients' choice when seeking motor-vehicle personal-injury attorneys'

services; reduces the employment opportunity of motor vehicle personal injury attorneys within the market and the salaries that they can command; and reduces the availability to other law firms of employees with a valuable book of business.

143.    The anticompetitive consequences of Isaacs' scheme far outweigh any arguable procompetitive benefits. Isaacs is attempting to establish a monopoly through unlawful means.

144.    Isaacs' scheme was, in the aggregate, an act of monopolization undertaken with the specific intent to monopolize the market for motor-vehicle personal-injury attorneys' services in greater Kentuckiana, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

### Count Two: Agreement In Restraint Of Trade In Violation Of 15 U.S.C. § 1

### (Contractual Restraints On Severing Employment)

145.    The plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

146.    Section 1 of the Sherman Act prohibits every contract, combination, or conspiracy in restraint of trade or commerce among the several states. 15 U.S.C. § 1. A vertical agreement— that is, an agreement between parties operating at different levels of a market—is subject to scrutiny under Section 1's rule of reason where its practical effect is to unreasonably restrain competition in a relevant market.

147.    The employment agreement between Isaacs and Mr. Alexiou constitutes a vertical agreement within the meaning of Section 1. Isaacs operates as a dominant provider of motor-vehicle personal-injury attorneys' services in greater Kentuckiana. Mr. Alexiou, as an attorney and employee of that firm, operated as a provider of those same services within the firm's structure. The agreement between them is therefore not only an agreement between an employer and employee, but an agreement between a dominant market participant and one of its service providers—a vertical relationship analogous to that between a franchisor and franchisee, or a

supplier and distributor—imposing post-separation restraints that directly affect competition in the relevant market.

148.    While Mr. Alexiou entered into the agreement, he did not benefit from it and was in fact harmed by it. Only Isaacs benefited from the agreement.

149.    The relevant market affected by Isaacs' vertical restraint, as described above, is the market for motor-vehicle personal-injury attorneys' services in greater Kentuckiana. Because of the nature of this market, two groups are impacted. First, are the attorneys seeking to move laterally within the market. And second, are the clients those attorneys serve. Both aspects of the market are directly and substantially restrained by the terms of Isaacs' employment agreement with Mr. Alexiou and Isaacs' conduct post-separation.

150.    With respect to the attorney labor market, Isaacs' agreement operates functionally as an input foreclosure. By encumbering Mr. Alexiou's book of business with a seventy percent fee demand, Isaacs rendered him materially less attractive as an employment candidate to competing firms in greater Kentuckiana. A competing firm evaluating Mr. Alexiou as a lateral hire must weigh not only the value of the clients he brings with him, but the likelihood that Isaacs will sue, the cost of defending that suit, and the prospect that seventy percent of fee recoveries on those clients' cases will flow to Isaacs rather than to the hiring firm. As described above, these encumbrances are not merely theoretical deterrents; they are financially deleterious in practice. Isaacs thereby forecloses competing firms from freely competing for experienced motor-vehicle personal-injury attorneys in the relevant labor market.

151.    With respect to the client services side of the market, Isaacs' agreement operates to restrain client choice. By purporting to retain a seventy percent interest in the fee recoveries of any client who elects to follow Mr. Alexiou to a new firm, the agreement functions to tie those clients'

41

economic value to Isaacs even after the clients have freely and voluntarily chosen different representation. This restraint suppresses competition in the market and forecloses competing firms like Alex R. White, PLLC from fully realizing the economic value of attorneys they hire away from Isaacs.

152.    Isaacs' restraint of trade is not limited to its agreement with Mr. Alexiou alone. On information and belief, Isaacs has imposed materially identical agreements on all or substantially all of its attorney-employees in greater Kentuckiana. The cumulative foreclosure effect of these uniform vertical agreements, each individually restraining one attorney's mobility and one competing firm's access to that attorney's book of business, is substantial. When a dominant firm with Isaacs' market position imposes identical post-separation restraints across its entire attorney workforce, the aggregate effect is to foreclose a significant portion of the available supply of experienced motor-vehicle personal-injury attorneys from meaningful competition in the relevant labor market. No single competing firm can realistically build a motor-vehicle personal-injury practice in greater Kentuckiana without access to experienced lateral attorneys. Isaacs' agreements ensure that a substantial number of attorneys arriving in the market do so encumbered by demands that make hiring them a liability.

153.    The vertical restraint imposed by Isaacs' employment agreement is unreasonable under the rule of reason. In conducting the rule of reason analysis, the Court should consider: (a) the nature and scope of the restraint; (b) Isaacs' market power in the relevant markets; (c) the actual anticompetitive effects of the restraint; and (d) whether any procompetitive justification offered by Isaacs is sufficient to outweigh those effects and could not be achieved through less restrictive means.

154. As to the nature and scope of the restraint, the seventy percent fee demand is not a narrowly tailored protection of a legitimate business interest. It applies universally to every client, on every case, regardless of case status at departure, regardless of the relative contributions of firm and attorney to the matter, and presumably regardless of any express preference from the client. It is accompanied by an $8,000 per-client liquidated damages provision, a $6,000 case acquisition cost designed to survive and compensate for an adverse quantum meruit determination, a requirement that client election notices be issued on Isaacs' terms, and the threat (now realized) of litigation against both the departing attorney and his new employer. The restraint is sweeping in scope and designed to be inescapable in effect.

155. As described above, Isaacs is the dominant motor-vehicle personal-injury firm in greater Kentuckiana. That market dominance amplifies the anticompetitive effect of every restraint Isaacs imposes on its employees: an attorney leaving a dominant firm faces a fundamentally different competitive landscape than one leaving a marginal competitor, and competing firms face fundamentally greater barriers when the encumbered attorney came from the market's dominant player.

156. The restraints imposed by Isaacs' employment agreement have caused actual, demonstrable harm in both the attorney services and client services aspects of the market. With respect to attorney services, Mr. Alexiou arrived at Alex R. White, PLLC as a materially encumbered employment candidate, his book of business subject to a seventy percent fee demand and the threat of litigation against his new employer. With respect to client choice, on information and belief, a number of Mr. Alexiou's clients were directly deprived of the opportunity to elect Mr. Alexiou as their attorney. Of course, this deprived them of that choice as well as depriving Mr. Alexiou of any potential recovery from their cases. Also on information and belief, at least one

other former Isaacs attorney, facing the same restraints, abandoned her entire book of business rather than subject herself and her new employer to Isaacs' anticompetitive scheme — a direct reduction in the output of motor-vehicle personal-injury attorney services available to clients in greater Kentuckiana.

157.    Isaacs has no legitimate procompetitive justification for a seventy percent across-the-board fee demand. To the extent Isaacs might argue that the agreement protects its investment in client acquisition and case development, that interest is fully and adequately protected by a proportional fee-sharing arrangement calibrated to the work actually performed. This is precisely what Kentucky's rules of professional conduct require. *See* SCR 3.130 1.5(e); *Franklin v. Emery Law Office*, *Inc.*, 2023-CA-0586-MR, 2024 WL 2788214 (Ky. App. May 31, 2024). A seventy percent uniform demand is not necessary to protect that interest; it vastly exceeds what that interest could justify; and it was specifically designed, as the Agreement's own quantum meruit fallback provision reveals, to survive legal challenge rather than to reflect an honest assessment of Isaacs' actual contributions to any given case.

158.    The anticompetitive effects of Isaacs' vertical restraint substantially outweigh any procompetitive benefit. The restraint forecloses competition in the relevant market. It reduces output, suppresses price competition, artificially constrains client choice, and serves as an instrument of market foreclosure in the hands of the dominant firm in the market.

159.    The agreement between Isaacs and Mr. Alexiou has a substantial effect on interstate commerce. Alex R. White, PLLC has clients in both Kentucky and Indiana, and Mr. Alexiou is barred in and represents clients in both states.

160.    As a direct and proximate result of Isaacs' unlawful vertical agreement in restraint of trade, Plaintiffs Alex R. White, PLLC and Nicholas Alexiou have been injured in their business

and property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a). Those injuries include, *inter alia*: lost attorney's fees on cases belonging to clients who elected to follow Mr. Alexiou to Alex R. White, PLLC that are encumbered by Isaacs' anticompetitive fee demands; lost fees on cases belonging to clients whom Isaacs prevented Mr. Alexiou from contacting; costs incurred in defending against Isaacs' sham litigation; and the diminution in the competitive value of Mr. Alexiou's book of business as an employment candidate caused directly by Isaacs' vertical restraint.

### Count Three: Abuse Of Process

161.    The Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

162.    Abuse of process is an intentional tort under Kentucky common law. It requires: (1) the existence of an ulterior purpose in the use of legal process; and (2) a willful act in the use of that process not proper in the regular conduct of the proceeding. It focuses on the wrongful use of process, the deployment of legal machinery as a weapon of coercion toward an end other than seeking legitimate judicial relief.

163.    Isaacs initiated a lawsuit against Mr. Alexiou. That lawsuit, as explained above, is objectively baseless on its merits. But the abuse of process claim does not rest on the objective baselessness of the suit alone. It rests on what Isaacs' motivation was in filing the action. Namely, Isaacs did not file the action against Mr. Alexiou as a means of recovering under his employment agreement. Instead, the suit was a shot across the bow, a public warning to any other attorney who might be considering leaving Isaacs to go to work for the competition.

164.    The evidence of Isaacs' ulterior motive is evident from the bare bones nature of the initial pleading. As explained above, Isaacs did not even plead breach of contract, which was the

45

only claim under the contract purportedly entitling them to either a seventy percent share of the recovery or control over the client election process.

165.    And we know why. Isaacs omitted a breach of contract claim because it would have deprived it of the opportunity to make use of the public litigation process to ramp up pressure on the competition and maximize the reputational harm to Mr. Alexiou and Alex R. White, PLLC.

166.    Moreover, Isaacs' ulterior motive is further apparent through its use of the amendment process as a retaliatory weapon to double down on its efforts to manipulate the free market for motor-vehicle personal-injury attorneys' services in Greater Kentuckiana and maximize reputational harm to potential competition within that market.

167.    Specifically, when Mr. Alexiou's counsel filed a motion to dismiss, Isaacs responded by filing an amended complaint adding Alex R. White, PLLC as a defendant. Isaacs filed the amended complaint not because new facts had come to light or because a previously unrecognized legal theory had crystallized. Isaacs used the amendment process as a mechanism of retaliation against a party that decided to hire Mr. Alexiou. Specifically, Isaacs wished to drive a wedge between Mr. Alexiou and his new employer, Alex R. White, PLLC. And what better way than to drag Mr. Alexiou's employer into court?

168.    Isaacs' ulterior motives are again clear from its choices. Before the original complaint was filed, Mr. White offered to honor the full seventy percent fee demand in Isaacs' employment agreement with Mr. Alexiou. Had Isaacs accepted that offer, any need for litigation would have been obviated. Thus, naming Alex R. White, PLLC was not merely unnecessary to obtain the stated ends of the proceeding. It was a blatant power grab aimed at crushing the competition. Alex R. White, PLLC was not the first competitor law firm to fall victim to Isaacs' tactics, nor was it the last.

169. The claims asserted against Alex R. White, PLLC in the amended complaint are, as explained above, objectively meritless. The aiding and abetting breach of fiduciary duty claim fails because no fiduciary duty existed for Mr. Alexiou to breach. The tortious interference with employment contract claim fails because Mr. White explicitly offered to honor the contract's terms before any suit was filed. These claims were not brought because Isaacs had a colorable legal theory against Alex R. White, PLLC. They were brought because adding a new defendant was the most efficient way to thwart competition, impose maximum litigation cost, and do the most reputational harm on the parties who had refused to capitulate to Isaacs' demands.

170. The improper purpose animating Isaacs' use of process isn't just inferable. It is documented. The Kentucky Hammer's own text messages establish that he had decided to sue before any formal demand was made, that he escalated his demands beyond the terms of his own contract when those terms were accepted, that he threatened to report Mr. Alexiou to ethics authorities with no factual basis, and that he viewed the litigation as a mechanism for enforcing market manipulations and restraining competition rather than for obtaining a judicial remedy. These communications are direct evidence of the collateral purpose that the tort of abuse of process is designed to address.

171. As a direct and proximate result of Isaacs' abuse of process, Plaintiffs Alex R. White, PLLC and Nicholas Alexiou have suffered damages including: the costs and attorney's fees incurred in defending against a litigation initiated and prosecuted for improper purposes; reputational harm caused by Isaacs' deliberate use of public court filings as an instrument of professional destruction; the diversion of time, attention, and financial resources from productive legal practice to litigation defense; and, with respect to Mr. Alexiou individually, the emotional distress, anxiety, and professional uncertainty caused by being subjected to baseless litigation at a

47

formative stage of his legal career. Plaintiffs are entitled to recover compensatory damages in an amount to be determined at trial, together with punitive damages given the intentional, malicious, and oppressive nature of Isaacs' conduct, pursuant to KRS 411.184.

### Count Four: Tortious Interference with Prospective Business Advantage

### (by Alex R. White, PLLC)

172.    Plaintiff Alex R. White, PLLC incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

173.    At the time of Mr. Alexiou's departure from Isaacs, he maintained active attorney-client relationships with numerous motor-vehicle accident victims whose cases he had personally handled while employed at the firm.

174.    In the ordinary course, and consistent with the ethics guidance of Kentucky and neighboring states, those clients reasonably would have been notified that Mr. Alexiou was departing, informed of his new affiliation with Alex R. White, PLLC, and given a meaningful opportunity to elect to continue their representation with him and Alex R. White, PLLC.

175.    Alex R. White, PLLC had a valid and reasonable expectation of continuing economic relationships with a substantial number of those clients, in the form of contingent-fee representations to be performed by Mr. Alexiou in the scope of his employment with Alex R. White, PLLC.

176.    Isaacs knew of Mr. Alexiou's existing attorney–client relationships and of Plaintiffs' expectancy that many of those clients would elect to depart with him to Alex R. White, PLLC.

177.    Isaacs intentionally interfered with these prospective business relationships by, among other things: (a) asserting exclusive control over client election letters and refusing to allow

Mr. Alexiou to promptly and directly notify many of his clients of his departure; (b) purporting to reserve the right to sign such letters "on behalf" of Mr. Alexiou; and (c) imposing confiscatory 70-percent fee-retention provisions, "case acquisition costs," and liquidated-damages clauses designed to make it economically irrational for Plaintiffs to accept or continue representing those clients.

178. Isaacs undertook this interference with improper motive and by wrongful means, including contracts and practices that conflict with the public-policy limitations on restrictive attorney agreements recognized by Kentucky ethics rules and jurisprudence.

179. As a direct and proximate result of Isaacs' interference, a substantial number of the clients whose cases Mr. Alexiou had personally handled at Isaacs never received timely, neutral notice of his departure, never had a meaningful opportunity to elect to continue with him, and did not retain Alex R. White, PLLC.

180. Alex R. White, PLLC thereby lost an opportunity with respect to many of Mr. Alexiou's existing and prospective attorney–client relationships and the contingent-fee revenues those relationships would have generated. The value of Mr. Alexiou's portable book of business to Alex R. White, PLLC, was substantially diminished.

181. Alex R. White, PLLC has suffered special damages in an amount to be proven at trial, including lost profits on the cases of clients who would have retained Mr. Alexiou and Alex R. White, PLLC but for Isaacs' conduct, and the diminished value of Mr. Alexiou's practice as a competitive asset.

182. Alex R. White, PLLC is entitled to recover compensatory and punitive damages under Kentucky law, together with pre- and post-judgment interest, and such other relief as the Court deems just and proper.

49

## VI.    DEMAND FOR JUDGMENT

WHEREFORE, the Plaintiffs respectfully demand that this Court:

A.    Issue a declaration that the employment agreement between Isaacs and Mr. Alexiou, including its seventy percent fee demand, its liquidated damages provision, its case acquisition cost schedule, and its client election notice provisions, is void and unenforceable as contrary to public policy, in violation of the Kentucky Rules of Professional Conduct, and as an unlawful restraint of trade;

B.    Issue a permanent injunction enjoining Isaacs, its officers, agents, employees, and all persons acting in concert with it, from: (i) enforcing or attempting to enforce the anticompetitive provisions of any employment agreement with any current or former attorney-employee; and (ii) engaging in any further acts in furtherance of the anticompetitive scheme described herein;

C.    Award the Plaintiffs their actual damages in an amount to be determined at trial, including lost attorney's fees on encumbered client matters, lost fees on client matters from which Mr. Alexiou was wrongfully excluded, costs incurred in defending against Isaacs' sham litigation, emotional distress damages incurred, and damage to professional reputation and competitive standing in the relevant market;

D.    Award the Plaintiffs treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), reflecting three times the actual damages sustained by Plaintiffs as a result of Isaacs' violations of Sections 1 and 2 of the Sherman Act;

E.    Award the Plaintiffs punitive damages pursuant to KRS 411.184, in an amount sufficient to punish Isaacs for its intentional, malicious, and oppressive conduct and to deter it and others similarly situated from engaging in like conduct in the future;

F.    Award the Plaintiffs their reasonable attorneys' fees and costs of suit pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and as otherwise provided by law;

G.      Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## VII.    JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the plaintiffs demand a trial by jury on all issues so triable.

Dated: June 2, 2026                                      Respectfully Submitted,

*/s/ Chris K. Stewart PLLC*
**CHRIS K. STEWART PLLC**
Chris K. Stewart
KBA No. 97351
4010 DuPont Cir. , Ste 309
Louisville, KY 40207
(502) 457-1757
chrisstewartjd@gmail.com

**LITVINOV LAW PLLC**
Aleksandr "Sasha" Litvinov
KBA No. 95598
PO Box 17004
Louisville, KY 40217
(502) 882-0888
sasha@litvinovlaw.com

*Counsel for Plaintiffs*